ARDC No. 03121542                6975-08004/WGB/MMS/kas

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DR. CARY BORTNICK, M.D. and DIANE BORTNICK, )
                                            )
                    Plaintiffs,             )
                                            )        No.
v.                                          )
                                            )
CHASE HOME FINANCE, L.L.C., a Delaware Limited )
Liability Company, and AMERICAN SECURITY    )
INSURANCE COMPANY d/b/a ASSURANT            )
SPECIALTY PROPERTY,                         )
                                            )
                    Defendants.             )

```
FILED: JUNE 20, 2008
08CV3560
JUDGE ANDERSEN
MAGISTRATE JUDGE COX
TG
```

<u>NOTICE OF REMOVAL</u>

Pursuant to *Title 28 U.S.C. §1441, et seq., 28 U.S.C. §1331 and 28 U.S.C § 1332,* Defendant, AMERICAN SECURITY INSURANCE COMPANY, incorrectly sued as AMERICAN SECURITY INSURANCE COMPANY d/b/a ASSURANT SPECIALTY PROPERTY, by and through its attorneys, William G. Beatty and Meghan M. Sciortino, JOHNSON & BELL, LTD., of counsel, hereby gives notice of the removal of the above captioned action from the Circuit Court of Cook County, Cause No. 08 CH 17522, to the United States District Court, Northern District of Illinois, Eastern Division, and in support thereof, states the following:

1.      This action is being removed to federal court based upon federal question jurisdiction, insofar as plaintiffs' claim arises under, and is governed by, federal law, specifically 12 U.S.C. §2605, as is more fully set forth below.

2.      As alternative grounds for removal, this action is being removed to federal court based upon the diversity of citizenship of the parties to this cause, and the existence of the requisite amount in controversy, as is also more fully set forth below.

3.      On or about May 23, 2008, plaintiffs, Dr. Cary Bortnick, M.D. and Diane Bortnick, initiated the above captioned lawsuit by the filing of a Complaint entitled *Dr. Cary Bortnick, M.D. and Diane Bortnick v. Chase Home Finance, L.L.C., a Delaware Limited Liability*

*Company and American Security Insurance Company d/b/a Assurant Specialty Property,* docket No. 08 CH 17522, in the Circuit Court of Cook County, Illinois. A copy of the Complaint at Law is attached hereto as Exhibit "A", and incorporated herein by reference.

4.      On or about May 23, 2008, plaintiffs caused a Summons to be issued for service upon the registered agent of American Security Insurance Company. A copy of said Summons is attached hereto as Exhibit "B", and incorporated herein by reference.

5.      Service was obtained on American Security Insurance Company's registered agent on May 23, 2008.

6.      The United States District Court for the Northern District of Illinois, Eastern Division, has jurisdiction over the above described action pursuant to 28 U.S.C. §1332 and 28 U.S.C. §1441 for the following reasons:

(a)     Plaintiffs, Dr. Cary Bortnick, M.D. and Diane Bortnick, at the time the lawsuit was commenced and at all relevant times, have been residents and citizens of the State of Illinois;

(b)     The defendant, American Security Insurance Company, at all relevant times has been a Delaware corporation with its principal place of business in Georgia;

(c)     The defendant, Chase Home Finance, L.L.C., at all relevant times has been a Delaware limited liability corporation with its principal place of business in New Jersey;

(d)     According to the allegations contained in the Complaint filed by the plaintiffs herein, plaintiffs intend to seek damages in excess of $91,586.66 plus costs.

(e)     Based upon the foregoing, it is defendants' good faith belief that while liability and damages issues will be contested, the amount in controversy in this action exceeds $75,000.00 exclusive of interest and costs;

(f)     This Notice of Removal is being filed with the Clerk of the United States District Court for the Northern District, Eastern Division, within thirty (30) days of service of summons;

(g)     This Notice of Removal is being filed with the consent of the co-defendant in this matter, Chase Home Finance, L.L.C. A copy of the Consent to Removal is attached hereto as Exhibit "C", and incorporated herein by reference.

(h)    This action, based upon diversity of citizenship and the amount in controversy is, therefore, properly removable, pursuant to 28 U.S.C. §1441(a).

7.    The United States District Court for the Northern District of Illinois, Eastern Division, also has jurisdiction over the above described action pursuant to 28 U.S.C. §1331 as plaintiffs are seeking recovery pursuant to 12 U.S.C. §2605(g) in Count II of their complaint thereby invoking federal question jurisdiction.

8.    In accordance with 28 U.S.C. §1447(b) there are attached to this Notice of Removal true and correct copies of all pleadings and process served upon the defendant by the plaintiffs in this cause.

9.    In accordance with 28 U.S.C. §1446(d) this defendant shall give prompt written notice of the removal of this case to the plaintiffs, and shall file a copy of this Notice of Removal with the Clerk of the Circuit Court of Cook County, Illinois.

WHEREFORE, defendant, AMERICAN SECURITY INSURANCE COMPANY, respectfully requests that this case proceed before this Court as an action properly removed.

Respectfully submitted,

/s/ William G. Beatty
William G. Beatty      Bar No. 03121542
Attorney for defendant, American Security Insurance Company
Johnson & Bell, Ltd.
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603
(312) 372-0770
Fax: (312) 372-9818
E-mail: beattyw@jbltd.com

CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2008 I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

William G. Beatty      Bar No. 03121542
Attorney for defendant, American Security Insurance Company
Johnson & Bell, Ltd.
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603
(312) 372-0770
Fax: (312) 372-9818
E-mail: beattyw@jbltd.com

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

**RECEIVED**
STATE OF ILLINOIS

MAY 2 3 2008
*10: 30 TC*

DEPT. OF INSURANCE
CHICAGO, ILLINOIS

DR. CARY BORTNICK, M.D. and )
DIANE BORTNICK )
        Plaintiffs, )
 )
 )
v. )
 )
CHASE HOME FINANCE, L.L.C., )
a Delaware Limited Liability Company, and )
AMERICAN SECURITY INSURANCE )
COMPANY d/b/a ASSURANT SPECIALTY )
PROPERTY, )
 )
        Defendants. )

No. **08CH17522**

**JURY DEMANDED**

**COMPLAINT**

Plaintiffs, Dr. Cary and Diane Bortnick (the "Bortnicks"), by their attorneys, Elliot M.

Samuels and Kelly, Olson, Michod, DeHaan & Richter, L.L.C., complain against Defendant Chase

Home Finance, L.L.C., ("Chase") and American Security Insurance Company d/b/a "Assurant

Specialty Property ("Assurant"), as follows:

1.    The Bortnicks are residents of Cook County, Illinois.

2.    Chase is a Delaware Limited Liability Company and is registered to do business in

Illinois. *Inter alia*, Chase is in the business of providing mortgages and related lender services to

purchasers of residential real estate.

3.    Assurant is a Delaware insurance company licensed to issue insurance policies in

Illinois. Assurant is in the business of issuing insurance policies and insurance-related products and,

on information and belief, is a subsidiary or entity under the control of Chase.

4.    Venue is proper in Cook County pursuant to 735 ILCS 512-101 because, *inter alia*,

the transactions out of which this action arose occurred in Cook County.

DEFENDANT'S EXHIBIT
*A*

5.    On or about October 31, 2001, while in Illinois, the Bortnicks, sought to refinance the mortgage on their Florida second home, located at: Lot 89, The Palms at Boca Pointe, according to the plat thereof, as recorded in Plat Book 48, Page 167, of the Public Records of Palm Beach County, Florida, commonly known as 23380 Butterfly Palm Court, Boca Raton, Florida 33433-6121 (the "Property").

6.    On or about October 31, 2001, the Bortnicks entered into a Mortgage Agreement (Loan #618550267) with ABN AMRO Mortgage Group, Inc. (the "Lender"), based on the representations made in the Mortgage Agreement (the "Note"). A copy of the Mortgage, Note, and related documentation is hereby attached as Exhibit A to the Complaint and incorporated herein.

7.    The Lender represented to the Bortnicks that the Bortnicks would put their real estate taxes and premiums for insurance in escrow and the Lender would pay the taxes and the insurance premiums.

8.    Under the Note, the Bortnicks were required to either obtain insurance coverage on the Property or the Lender would have the ability to obtain insurance coverage at the Lender's obligation and the Bortnicks' expense. Mortgage, p. 4, ¶ 5. The costs for such coverage provided by the Lender became part of the debt of the Bortnicks. Id.

9.    The Note contains certain representations about the Bortnicks and the Lender's obligations relating to payment of insurance coverage from Escrow Funds, including:

a.    Borrower shall pay to Lender...until the note is paid in full, a sum (the "Funds") to provide for payment of amounts due for...(c) premiums for any and all insurance required by the Lender of under Section 5. Mortgage, p. 3, ¶ 3.

b.    Lender shall give to Borrower, without charge, an annual accounting of the

2

funds as required by RESPA (Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§2601 *et seq*). Id.

    c.    The funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.

    d.    If there is a surplus of funds held in escrow as defined by RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. Id.

    e.    Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any funds held by Lender. Id.

10.    The Lender required that Escrow Funds be used to pay flood insurance, hazard insurance, and county tax. Initial Escrow Account Disclosure Statement (also part of Exhibit A).

11.    At some point between October 31, 2001, and October 2, 2003, Chase became the holder of the Note.

12.    As holder of the Note, Chase became obligated under the terms and conditions of the Note. (Chase Loan No. 1692959298).

13.    Specifically, Chase became obligated to apply the Funds contained in Escrow to premiums for hazard insurance.

14.    Between October 2, 2003, and November 28, 2005, while obligated to obtain insurance for the Property,

    a.    Chase failed to maintain insurance for the Bortnicks,

    b.    failed to obtain alternate insurance coverage as required,

      c.      failed to inform the Bortnicks that such insurance was not covering any losses to the Property, and

      d.      failed to account for such excess escrow funds (not paid for insurance but accepted by Chase), or return those unpaid funds to the Bortnicks. Attached hereto and incorporated herein as Exhibit B is a copy of a letter received by the Bortnicks from Chase outlining Chase's failure to obtain insurance, during the relevant time, dated July 11, 2006 (the "7/11/06 Chase Letter"). Attached hereto and incorporated herein as Exhibit C is a copy of a letter received by the Bortnicks from Chase outlining Chase's audit of the Bortnicks files showing that they did not have current hazard insurance information for the Bortnicks, on November 28, 2005 (the "11/28/05 Chase Letter").

15.      As a result, on or about November 24, 2005, no applicable hazard insurance policy covered the Property.

16.      On or about November 24, 2005, the Bortnick's Property suffered extensive damage due to a broken water pipe.

17.      When the Bortnicks contacted Chase to inquire as to the status of their insurance in order to make a claim, both Chase and Chase's alter ego, Assurant, misrepresented the status of the insurance coverage on Plaintiff's property; indeed, Assurant went so far as to misrepresent to Plaintiff that there was a valid enforceable insurance policy in effect when the loss occurred.

18.      Thereafter, Defendants attempted, albeit unsuccessfully, to compel Plaintiff to arbitrate their damage claim pursuant to the provisions of a back-dated or non-existent insurance policy.

19.      Despite repeated demands for accounting by the Bortnicks and counsel for the

4

Bortnicks, the Bortnicks did not discover the extent of Chase's failure to obtain insurance until the Bortnicks received the 7/11/06 Chase Letter.

20.    Chase made representations that, despite this situation, Chase would use one of its insurance coverage affiliates, American Security Insurance, also known as Assurant Specialty Property ("Assurant"), to 'back-date' a new policy (Policy No. ONC002298100) giving the Bortnicks coverage for the incident. Attached hereto and incorporated herein as Exhibit D is a copy of a letter received by the Bortnicks from Chase outlining Chase's attempt to 'back-date' the insurance company, dated December 19, 2005, back to January 25, 2005 (the "12/19/05 Chase Letter").

21.    Thereafter, Chase apparently claims to have issued the back-dated policy No. ONC002298100.

22.    The new 'back-dated' policy did not provide coverage to the extent that the Bortnicks' original policy would have and provided inferior service to the Bortnicks.

### Count One - Fraudulent Misrepresentation

23-44.    The Bortnicks hereby reallege and incorporate herein paragraphs 1-22 of the common allegations as though fully set forth in Count I.

45.    The Lender represented to the Bortnicks that the Property would be insured against loss and that the Lender would apply the payments that the Bortnicks placed in escrow towards those insurance payments.

46.    The Lender made the representations concerning insurance coverage and direction of payments from escrow to induce the Bortnicks to enter into the Note with the Lender.

47.    The Bortnicks relied upon those representations concerning insurance coverage and direction of payments from escrow in deciding to enter into the Note for the Property.

5

48.    Chase became the holder of the Note and therefore adopted those representations concerning insurance coverage and those obligations under the Note relating to coverage.

49.    Chase's adopted representations were false.

50.    Specifically, Chase failed to direct payments from Escrow to pay for hazard insurance premiums and therefore failed to provide continuous insurance coverage for the Bortnicks.

51.    Chase knew or should have known that Chase was not providing the services Chase represented that Chase would.

52.    Chase admitted that Chase knew that the Bortnicks were not covered by insurance on or about November 24, 2005. See the 7/11/06 Chase Letter and the 11/28/05 Chase Letter.

53.    The Bortnicks have been damaged by the false statements of Chase regarding insurance coverage and direction of payments from escrow. They paid substantial sums for the purchase of the Property and have incurred serious damages as a result of Chase's fraudulent misrepresentations, including flood damage, storage fees, loss of rental income, attorney's fees, and alternative travel expenses, totaling at least $91,586.66 in non-reimbursed expenses.

54.    The false representations of Chase were intentional and malicious, so as to justify the imposition of punitive damages.

WHEREFORE, the Bortnicks request this Court for the following relief:

A.    Enter judgment in favor of the Bortnicks on Count I of the Complaint in an amount in excess of $50,000 and, in addition, award reasonable attorneys fees and punitive damages; and

B.    Grant the Bortnicks such other relief as this Court deems equitable and just.

## Count Two - Violation of 12 U.S.C. §2605 (RESPA)

55-76. The Bortnicks repeat and reallege paragraphs 1- 22 of the common allegations as though fully set forth herein.

77.    Pursuant to 12 U.S.C. §2605(g), "[i]f the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due."

78.    Sections 3 and 5 of the Mortgage required the Bortnicks to provide the Lender and, subsequently, Chase, with payments for insurance premiums.

79.    Chase was obligated to make payments in a timely manner as such payments became due.

80.    Upon information and belief, Chase failed to make the insurance payments in a timely manner as they became due.

81.    As a result of Chase's failure to make timely payments pursuant to Chase's obligation, the Bortnicks were not covered by insurance when the water pipe burst on November 24, 2005.

82.    The 'back-dated' insurance policy allegedly issued by Chase, provided inferior coverage to the Bortnicks.

83.    Therefore, the Bortnicks were damaged as a result of Chase's violation of 12 U.S.C. §2605(g) and, pursuant to 12 U.S.C. §2605(f)(1), is entitled to actual damages suffered as a result of the failure to make timely payments, totaling at least $91,586.66 in non-reimbursed expenses, and any additional damages as the Court may allow in an amount not to exceed $1,000.

7

WHEREFORE, the Bortnicks request this Court for the following relief:

A.      Enter judgment in favor of the Bortnicks on Count III of the Complaint; and

B.      Grant the Bortnicks such other relief as this Court deems equitable and just.

### Count Three - Breach of Contract

84-95.  The Bortnicks repeat and re-allege paragraphs 1- 22 of the common allegations as though fully set forth herein.

96.     The Lender required that hazard insurance cover the Property.

97.     The Lender agreed that the Bortnicks would put his real estate taxes and premiums for insurance in escrow and the Lender would pay the taxes and the insurance premiums.

98.     The Lender also agreed that the Lender would provide an accounting for the funds put in escrow.

99.     The Lender agreed to pay such funds for premiums for any and all insurance required by the Lender.

100.    Chase assumed the Lender's obligations under the Note and Mortgage.

101.    Chase breached the agreement with the Bortnicks by failing to maintain insurance for the Bortnicks, failing to obtain alternate insurance coverage as required, failing to inform the Bortnicks that such insurance was not covering any losses to the Property, failing to account for such excess escrow funds (not paid for insurance but accepted by Chase), and failing to return those unpaid funds to the Bortnicks.

102.    As a result of Chase's breach of the Note with the Bortnicks, the Bortnicks were damaged in the amount of non-reimbursed expenses of at least $91,586.66.

WHEREFORE, the Bortnicks request this Court for the following relief:

8

A.    Enter judgment in favor of the Bortnicks on Count IV of the Complaint for $91,586.66; and

B.    Grant the Bortnicks such other relief as this Court deems equitable and just.

## Count Four - Breach of Fiduciary Duty

103-124.    The Bortnicks repeat and reallege paragraphs 1 - 22 of the common allegations as though fully set forth herein.

125.    The Lender, and Chase, as the holder of the Note and the holder of the Escrow Funds, was obligated to pay those Escrow Funds for insurance coverage provided to the Lender, and Chase.

126.    Chase, as a result of Chase's special position as the holder of the Note and the holder of the Escrow funds, had a fiduciary duty to pay for insurance coverage from the Escrow Funds or, at least, to inform the Bortnicks of any complications resulting from attempted payment of insurance coverage resulting in a lack of coverage for the Property.

127.    Based on Chase's special position, the Bortnicks justifiably relied upon Chase to pay for insurance coverage from the Escrow Funds or, at least, to inform the Bortnicks of any complications resulting from attempted payment of insurance coverage resulting in a lack of coverage for the Property.

128.    Chase failed to exercise reasonable care in the administration of the Note and the Escrow Funds by failing to pay for insurance coverage from the Escrow Funds and failing to inform the Bortnicks of any complications resulting from attempted payment of insurance coverage resulting in a lack of coverage for the Property.

129.    As a result of Chase's failure to exercise reasonable care in the administration of the Note and the Escrow Funds, the Bortnicks were neither aware of any lack of insurance coverage, nor

9

were the Bortnicks covered, when the Property was damaged on or about November 24, 2005, by a broken water pipe.

130.　As a result of Chase's failure to exercise reasonable care in the administration of the Note and the Escrow Funds with the Bortnicks, the Bortnicks were damaged as a result of the imposition of an inferior, substitute 'back-dated' policy issued by American Security Insurance, also known as Assurant Specialty Property.

WHEREFORE, the Bortnicks request this Court for the following relief:

A.　Enter judgment in favor of the Bortnicks on Count V of the Complaint for at least $91,586.66; and

B.　Grant the Bortnicks such other relief as this Court deems equitable and just.

## Count Five:　Action for Accounting

131-152.Plaintiffs repeat and reallege paragraphs 1-22 of the common allegations as though fully set forth herein.

153.　Sometime between October 2, 2003, and November 28, 2005, Chase became obligated under mortgage agreement with Bortnick.

154.　Chase agreed to hold certain funds relating to the Property, specifically those for real estate taxes and insurance premiums.

155.　Based on this agreement, Chase was responsible for administering the direction of payment of real estate taxes and insurance premiums as well as obtaining insurance for the Property.

156.　Under the Agreement, from on or about October 2, 2003, and February, 2007, the Bortnicks paid such moneys to Chase for payment of real estate taxes and insurance premiums.

157.　The Bortnicks paid such monies in confidence and trust for Chase to fulfill its

10

obligations and responsibilities under the agreement with respect to the taxes and insurance premiums.

158.    Upon information and belief, Chase failed to make timely payments to the insurance company and failed to inform the Bortnicks that the insurance company was not covering the Property. Chase continued to accept Bortnicks' payment in escrow and failed to return any payments for insurance premiums.

159.    On or about November, 2005, after a water pipe broke on the Property, the Bortnicks learned that Chase failed to get him continuous coverage or inform him that there was a problem with doing so.

160.    On or about April 11, 2007, Plaintiff made written demand upon Chase for an accounting of such monies received from the Bortnicks and paid out to and on Bortnicks' behalf and for Bortnicks' benefit, including to an insurance company.

161.    Chase has failed to provide the accounting as demanded by the Bortnicks.

162.    Plaintiffs require a formal accounting to account for and make determinations as to the monies paid and entrusted to Chase by the Bortnicks, and the payment and distributions of such monies by Chase to insurance providers and other entities pursuant to Chase's obligations under the agreement.

163.    Plaintiffs are entitled to an accounting which includes the production of all of Chase's books and records pertaining to the monies received from the Bortnicks, and all Chase's books, records, accountings and records of withholdings, payments, distributions and contributions made to and on behalf of the Bortnicks, to insurance providers and other entities, for the benefit of Bortnicks.

11

164.    Chase has failed and refused to account for such monies, payments, distributions and contributions.

165.    An accounting is necessary and warranted to account for, trace and determine:

      a.      The monies received by Chase from the Bortnicks under the Agreement;

      b.      The payments, distributions and contributions made by Chase to and on behalf of the Bortnicks, to insurance providers and other entities, for the benefit of the Bortnicks; and

      c.      Whether the withholdings, payments, distributions and contributions, if made by Chase, were complete and proper under the agreement.

166.    Chase is obligated to provide an accounting because:

      a.      Chase was entrusted with monies received from the Bortnicks under the Agreement in confidence and trust for the benefit of the Bortnicks;

      b.      There is a need for discovery in order to account for, trace and determine the matters set forth in paragraph 45 above; and

      c.      The books, records and information necessary for the accounting are within the province and control of Chase.

167.    The Bortnicks have no adequate remedy at law.

WHEREFORE, The Bortnicks request this Court for relief as follows:

A.    That Chase, be ordered to account for all monies received by Chase from the Bortnicks under the Agreement, and to insurance providers and other entities, for the benefit of the Bortnicks; and

B.    Grant Bortnicks such other relief as this Court deems equitable and just under the

circumstances.

## Count Six - Illinois and Florida Consumer Fraud Act

168-189.    The Bortnicks repeat and re-allege paragraphs 1-22 of the common allegations as though fully set forth herein.

190.    At all times relevant, there was in effect in Illinois a statute known as the Illinois Consumer Fraud and Defective Practices Act, 815 ILCS 505/2 *et seq.*

191.    At all times relevant, there was in effect in Florida a statute known as the Florida Deceptive and Unfair Trade Practices Act, FS § 501.201.

192.    At all times relevant times, the Chase was engaged in trade and commerce as defined in the Consumer Fraud and Defective Practices Act and Florida Deceptive and Unfair Trade Practices Act.

193.    At all times relevant times, the Lender was engaged in trade and commerce as defined in the Illinois Consumer Fraud and Defective Practices and the Act Florida Deceptive and Unfair Trade Practices Act.

194.    At all times relevant, Assurant was engaged in trade and commerce as defined in the Consumer Fraud and Defective Practices Act and the Florida Deceptive and Unfair Trade Practices Act.

195.    The Lender represented to the Bortnicks that the Property would be insured against loss and that the Lender would apply the payments that the Bortnicks placed in escrow towards those insurance payments.

196.    The Lender made the representations concerning insurance coverage and direction of payments from escrow to induce the Bortnicks to enter into the Note with the Lender.

13

197.    The Bortnicks relied upon those representations concerning insurance coverage and direction of payments from escrow in deciding to enter into the Note for the Property.

198.    Chase and/or Assurant became the holder of the Note and therefore adopted those representations concerning insurance coverage and those obligations under the Note relating to coverage.

199.    Chase's and/or Assurant's adopted representations were false. Chase and/or Assurant failed to provide continuous insurance coverage for the Bortnicks and failed to direct payments from escrow, despite assertions to the contrary.

200.    Chase and/or Assurant knew or should have known that Chase and/or Assurant was/were not providing the services represented that Chase/Assurant would. Chase/Assurant admitted that Chase/Assurant knew that the Bortnicks were not covered by insurance. See the 7/11/06 Chase Letter and the 11/28/05 Chase Letter.

201.    After admitting that Chase/Assurant failed to maintain adequate property insurance for the Bortnicks, Chase and/or Assurant misrepresented that a property insurance policy was in place.

202.    Chase and/or Assurant thereafter attempted to rely on an insurance policy not in existence on or about November 24, 2005 in limiting insurance coverage available to the Bortnicks concerning their November 24, 2005 property loss.

203.    The Bortnicks have been damaged by the false statements of Chase/Assurant regarding insurance coverage and direction of payments from escrow. The Bortnicks paid substantial sums for the purchase of the Property and have incurred serious damages as a result of Chase's/Assurant's fraudulent misrepresentations, including flood damage, storage fees, and loss of

14

rental income.

204.    The false representations of Chase/Assurant were intentional and malicious, so as to justify the imposition of punitive damages.

205.    The false statements of Chase/Assurant constitute unfair and/or deceptive conduct in violation of the Illinois Consumer Fraud and Deceptive Practices Act and the Florida Deceptive and Unfair Trade Practices Act.

WHEREFORE, the Bortnicks request this Court for the following relief:

A.    Enter judgment in favor of the Bortnicks on Count Six of the Complaint, including reasonable attorneys fees and punitive damages;

B.    Grant the Bortnicks such other relief as this Court deems equitable and just.


DR. CARY BORTNICK AND
DIANE BORTNICK

By: _____
        Elliot Samuels


Elliot M. Samuels
Attorney for Plaintiffs
30 South Wacker Drive
Suite 2300
Chicago, IL  60606
312-357-0590
Firm I.D. 48733

Kelly, Olson, Michod, DeHaan & Richter, L.L.C.
Attorneys for Plaintiffs
30 South Wacker Drive
Suite 2300
Chicago, IL  60606
312-236-6700
Firm I.D. 37474

15

Date: OCTOBER 31, 2001
Loan Number: 618550267
Lender: ABN AMRO MORTGAGE GROUP, INC.

Borrower: CARY BORTNICK AND DIANE BORTNICK

Property Address: 23380 BUTTERFLY PALM COURT

City, State, Zip Code: BOCA RATON, FL, 33433
First Payment Date: JANUARY 1, 2002

## FIRST PAYMENT LETTER

Dear  CARY BORTNICK AND DIANE BORTNICK

Congratulations on the purchase or refinance of your home! We are pleased to have been able to assist you in the financing of your home.

Mortgage Payment: Your first mortgage payment is due the first day of  JANUARY 1, 2002        and on the first of each month thereafter until the loan is satisfied. Your initial monthly payment includes the following:

| | |
|---|---|
| Principal and Interest | $1,548.67 |
| County Taxes | $360.79 |
| | |
| Hazard Insurance | $148.67 |
| Flood Insurance | $29.34 |
| Mortgage Insurance | |
| | |
| Less Buydown Subsidy        ( | ) |
| Total Mortgage Payment | $2,087.47 |

Enclosed are Temporary Payment Coupons that are to be used if you have not received your monthly statement. If you have not received the monthly statement by the 25th of the month prior to the first payment date, a Temporary Payment Coupon and the Total Mortgage Payment amount shown above should be sent to:
ABN AMRO MORTGAGE GROUP, INC., 4242 N. HARLEM AVE., NORRIDGE, IL  60706, ATTN: CASHIERING
Loan Number: Your Loan Number appears at the top of this page. In order to correctly credit your account, please provide your Loan Number on the front of your check.

Loan Servicing Inquiries: If you have any questions/concerns regarding the servicing of your loan, please direct them to:
ABN AMRO MORTGAGE GROUP, INC., 2600 W. BIG BEAVER RD., TROY, MI 48084

or you may call our Customer Service Department at  800-783-8900

Your signature below acknowledges that you are aware that the total monthly payment may increase or decrease each year due to increases or decreases in annual taxes and/or insurance premiums or due to the terms of a variable rate mortgage and also acknowledges receipt of Homeowners Handbook (at Application). the Temporary Payment Coupon and a copy of the First Payment Letter.

| | | | |
|---|---|---|---|
| CARY BORTNICK | Date | DIANE BORTNICK | Date |

(8-9-96) C-102099-11                      Page 1 of 2                          1457FY2  707


EXHIBIT
A

TEMPORARY COUPON

LOAN NUMBER  618550267                PAYMENT AMOUNT      $2,087.47
MORTGAGOR NAME CARY BORTNICK AND DIANE BORTNICK

PAYMENT DUE JANUARY 1, 2002

Please write the loan number listed above on the face          Use for additional funds
of your check and mail to the address below.                      over amount due

**A MONTHLY STATEMENT AND A PRE-ADDRESSED**

| | |
|---|---|
| PRINCIPAL | $1,548.67 |
| RESERVES | $538.80 |
| OTHER | |

**ENVELOPE WILL BE SENT TO YOU**

Send Payment to: ABN AMRO MORTGAGE GROUP, INC.
                 4242 N. HARLEM AVE.
                 NORRIDGE, IL  60706
                 ATTN: CASHIERING

TEMPORARY COUPON

LOAN NUMBER  618550267                PAYMENT AMOUNT      $2,087.47
MORTGAGOR NAME CARY BORTNICK AND DIANE BORTNICK

PAYMENT DUE FEBRUARY 1, 2002

Please write the loan number listed above on the face          Use for additional funds
of your check and mail to the address below.                      over amount due

**A MONTHLY STATEMENT AND A PRE-ADDRESSED**

| | |
|---|---|
| PRINCIPAL | $1,548.67 |
| RESERVES | $538.80 |
| OTHER | |

**ENVELOPE WILL BE SENT TO YOU**

Send Payment to: ABN AMRO MORTGAGE GROUP, INC.
                 4242 N. HARLEM AVE.
                 NORRIDGE, IL  60706
                 ATTN: CASHIERING

TEMPORARY COUPON

LOAN NUMBER  618550267                PAYMENT AMOUNT      $2,087.47
MORTGAGOR NAME CARY BORTNICK AND DIANE BORTNICK

PAYMENT DUE MARCH 1, 2002

Please write the loan number listed above on the face          Use for additional funds
of your check and mail to the address below.                      over amount due

**A MONTHLY STATEMENT AND A PRE-ADDRESSED**

| | |
|---|---|
| PRINCIPAL | $1,548.67 |
| RESERVES | $538.80 |
| OTHER | |

**ENVELOPE WILL BE SENT TO YOU**

Send Payment to: ABN AMRO MORTGAGE GROUP, INC.
                 4242 N. HARLEM AVE.
                 NORRIDGE, IL  60706
                 ATTN: CASHIERING

# TRUTH-IN-LENDING DISCLOSURE STATEMENT

DATE: OCTOBER 31, 2001

LOAN #: 618550267
LOAN AMT: $185,000.00

ABN AMRO MORTGAGE GROUP, INC.
2600 W. BIG BEAVER RD.
TROY, MICHIGAN 48084

BORROWER(S):
CARY BORTNICK and DIANE BORTNICK

ADDRESS: 23380 BUTTERFLY PALM COURT
         BOCA RATON, FL  33433

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | |
|---|---|---|---|---|
| 6.382 % | $ 99,643.04 | $ 179,117.56 | $ 278,760.60 | |

Your payment schedule will be:

| No. of Payment(s) | Amount of Payment(s) | Monthly Beginning | No. of Payment(s) | Amount of Payment(s) | Monthly Beginning | No. of Payment(s) | Amount of Payment(s) | Monthly Beginning |
|---|---|---|---|---|---|---|---|---|
| 180 | $1,548.67 | 1/01/2002 | | | | | | |

INSURANCE: THE FOLLOWING INSURANCE IS REQUIRED TO OBTAIN CREDIT: PROPERTY INSURANCE AND FLOOD INSURANCE. YOU MAY OBTAIN THIS INSURANCE FROM ANYONE YOU WANT THAT IS REASONABLY ACCEPTABLE TO THE CREDITOR. CREDIT LIFE AND CREDIT DISABILITY INSURANCE ARE NOT REQUIRED TO OBTAIN CREDIT.

SECURITY: YOU ARE GIVING A SECURITY INTEREST IN THE PROPERTY LOCATED
         AT: 23380 BUTTERFLY PALM COURT, BOCA RATON, FL  33433

FILING FEE:
LATE CHARGE: IF A PAYMENT IS MORE THAN 15 DAYS LATE, YOU WILL BE CHARGED 5.000% OF THE PAYMENT.
PREPAYMENT: IF YOU PAY OFF EARLY, YOU WILL NOT HAVE TO PAY A PENALTY AND YOU WILL NOT BE ENTITLED TO A REFUND OF PART OF THE FINANCE CHARGE.

ASSUMPTION: SOMEONE BUYING YOUR PROPERTY CANNOT ASSUME THE REMAINDER OF THE MORTGAGE ON THE ORIGINAL TERMS.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

THE UNDERSIGNED ACKNOWLEDGE RECEIVING AND READING A COMPLETED COPY OF THIS DISCLOSURE. THIS DOCUMENT IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND.

_____          _____
CARY BORTNICK                            DIANE BORTNICK

GRZ2 810

ABN AMRO MORTGAGE GROUP, INC.

2600 W. BIG BEAVER RD.
TROY, MICHIGAN 48084

DATE: OCTOBER 31, 2001
LOAN#:      618550267
LOAN AMOUNT:    $185,000.00

BORROWER(S) NAME(S):
  CARY BORTNICK and  DIANE BORTNICK

PROPERTY ADDRESS:  23380 BUTTERFLY PALM COURT
                   BOCA RATON, FL  33433

## ITEMIZATION OF AMOUNT FINANCED

ITEMIZATION OF THE AMOUNT FINANCED OF          $179,117.56

NET PROCEEDS FOR FUNDING                       $174,720.21

Ref HUD-1
  AMOUNT PAID TO OTHERS ON YOUR BEHALF

|     | RESERVES DEPOSITED WITH LENDER (LESS 0 INC IN PPD) |     |   $1,616.35 |
|-----|---------------------------------------------------|-----|-------------|
|     | RESERVES DEPOSITED WITH LENDER (LESS 0 INC IN PPD) |     | $275.00 |
| 803 | APPRAISAL FEE | to RESIDENTIAL APPRAISAL SER | $1,784.00 |
| 903 | HAZARD INSURANCE P | to HARBOR SPECIALTY INS. | $352.00 |
| 904 | FLOOD INSURANCE PR | to AMERICAN BANKERS | $370.00 |
| 1204 | FLORIDA INTANGIBLE | to STATE OF FLORIDA | |

  TOTAL AMOUNT PAID TO OTHERS                  $  4,397.35

  ITEMIZATION OF THE PREPAID FINANCE CHARGE

| 801 | ORIGINATION | to FLAGSHIP MORTGAGE CORP.--HO | $3,700.00 |
|-----|-------------|-------------------------------|-----------|
| 809 | PROCESSING | to FLAGSHIP MORTGAGE CORP.--HO | $675.00 |
| 811 | LENDER ADMINISTRAT | to ABN AMRO MORTGAGE GROUP, INC. | $475.00 |
| 1101 | CLOSING | to KLEAR TITLE | $200.00 |
| 1303 | EXPRESS MAIL | to KLEAR TITLE | $47.50 |
| 901 | INTEREST TO FIRST PAYMENT | 26 @ $ 30.19 = | $784.94 |

  TOTAL PREPAID FINANCE CHARGE                 $  5,882.44

The undersigned acknowledge receiving and reading a completed copy of this disclosure. Neither you nor the creditor previously has become obligated to make or accept this loan. This disclosure is not part of your loan contract.

_____          _____
CARY BORTNICK                            DIANE BORTNICK

GIAF1  0693

LOAN #: 618550267

# NOTE

OCTOBER 31, 2001                    DAVIE,                                   FLORIDA
[Date]                              [City]                                   [State]

23380 BUTTERFLY PALM COURT, BOCA RATON, FL 33433
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.    $185,000.00 (this amount is called ''Principal''), plus interest, to the order of the Lender. The Lender is   ABN AMRO MORTGAGE GROUP, INC., A DELAWARE CORPORATION.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the ''Note Holder.''

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  5.875%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1ST    day of each month beginning on  JANUARY 1, 2002.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  DECEMBER 1, 2016,    I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the ''Maturity Date.''

I will make my monthly payments at
4242 N. HARLEM AVE.
NORRIDGE, IL  60706
ATTN: CASHIERING
or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S.    $1,548.67.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a ''Prepayment.'' When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of       15       calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000%  of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

Initials: _____

FLORIDA FIXED RATE NOTE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3210 1/01
© 1999-2001 Online Documents, Inc.                          Page 1 of 2                          F3200FLN 0105

LOAN #: 618550267

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____(Seal)
CARY BORTNICK

_____(Seal)
DIANE BORTNICK

*[Sign Original Only]*

When recorded mail to:
ABN AMRO MORTGAGE GROUP, INC.
P.O. BOX 5064
TROY, MICHIGAN 48084
ATTN:FINAL/TRAILING DOCUMENTS

This instrument was prepared by:

——————————— [Space Above This Line for Recording Data] ———————————

LOAN #: 618550267

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
(A) "Security Instrument" means this document, which is dated    OCTOBER 31, 2001,    together with all Riders to this document.
(B) "Borrower" is   CARY BORTNICK AND DIANE BORTNICK, HUSBAND AND WIFE.

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is   ABN AMRO MORTGAGE GROUP, INC.

Lender is a  CORPORATION                              organized and existing under the laws of
DELAWARE.
MICHIGAN 48084.          Lender's address is   2600 W. BIG BEAVER RD., TROY,

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated OCTOBER 31, 2001.    The Note states
that Borrower owes Lender   ***********************ONE HUNDRED EIGHTY FIVE THOUSAND AND NO/100
************************************************** Dollars (U.S.    $185,000.00    )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
DECEMBER 1, 2016.
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and
all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed
by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider            ☒ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider  ☐ Other(s) [specify]
☐ 1-4 Family Rider           ☐ Biweekly Payment Rider

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Initials: ————
Form 3010 1/01                          Page 1 of 8                      FLUDEED 0008

LOAN #: 018550267

(H) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "**Escrow Items**" means those items that are described in Section 3.

(L) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the   COUNTY

[Type of Recording Jurisdiction] OF  PALM BEACH                          [Name of Recording Jurisdiction]:

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of  23380 BUTTERFLY PALM COURT, BOCA RATON,

[Street] [City]

Florida    33433           ("Property Address"):

[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender

LOAN #: 618550267

shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

   **2.   Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

   **3.   Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

   Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

   The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

   If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

   Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

   **4.   Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

   Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

   Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Initials: _____
Form 3010 1/01                                  Page 3 of 8                                    FLUDEED

LOAN #: 618950267

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws

Initials: _____

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    FLUDEED
Form 3010 1/01                                    Page 4 of 8

LOAN #: 618550267

or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                                    Page 5 of 8

Initials: _____

FLUDEED

LOAN #: 0185SD267

by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

LOAN #: 618550267

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                                    Page 7 of 8

Initials: _____
FLUDEED

LOAN #: 018550267

is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Attorneys' Fees. As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. Jury Trial Waiver. The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____    _____

_____ (Seal)        _____ (Seal)
CARY BORTNICK                       DIANE BORTNICK


State of FLORIDA,                   County of _____

The foregoing instrument was acknowledged before me this_____ (date)
by CARY BORTNICK AND DIANE BORTNICK, who is personally known to me or who has produced
_____ as identification.


                                   _____
                                   Signature

                                   _____
                                   Title or Rank

                                   _____
                                   Serial Number, (if any)

LOAN #: 618550267

# SECOND HOME RIDER

THIS SECOND HOME RIDER is made this **31ST** day of **OCTOBER, 2001,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to **ABN AMRO MORTGAGE GROUP, INC.**

(the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at: **23380 BUTTERFLY PALM COURT, BOCA RATON, FL 33433.**

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

**6. Occupancy.** Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Second Home Rider.

_____ (Seal)
**CARY BORTNICK**


_____ (Seal)
**DIANE BORTNICK**


MULTISTATE SECOND HOME RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3890 1/01                                                                    F3890RDU  0010

RESPA (Rev-2/95)

# Initial Escrow Account Disclosure Statement

Date: OCTOBER 31, 2001    Loan Number: 618550267    Case Number:

Servicer's Name and Address:
ABN AMRO MORTGAGE GROUP, INC.
2600 W. BIG BEAVER RD., TROY, MI 48084

Toll Free Number:
800-542-9512

Borrowers: CARY BORTNICK AND DIANE BORTNICK

Property Address: 23380 BUTTERFLY PALM COURT, BOCA RATON, FL. 33433

Mailing Address:  16 KENMORE AVENUE
DEERFIELD, IL 60015

This is an estimate of activity in your escrow account during the coming year based on payments anticipated to be made from your account.

| Month (or Period) | Payments to Escrow Account | Payments from Escrow Account | Description | Escrow Account Balance |
|---|---|---|---|---|
| Initial Deposit: | | | | $1,616.35 |
| JAN | 538.79 | | | 2,155.14 |
| FEB | 538.79 | | | 2,693.93 |
| MAR | 538.79 | | | 3,232.72 |
| APR | 538.79 | | | 3,771.51 |
| MAY | 538.79 | | | 4,310.30 |
| JUN | 538.79 | 352.00 | FLOOD INS | 4,497.09 |
| JUL | 538.79 | | | 5,035.88 |
| AUG | 538.79 | | | 5,574.67 |
| SEP | 538.79 | | | 6,113.46 |
| OCT | 538.79 | 1,784.00 | HAZARD INS | 4,868.25 |
| NOV | 538.79 | 4,329.46 | COUNTY TAX | 1,077.58 |
| DEC | 538.79 | | | 1,616.37 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

(PLEASE KEEP THIS STATEMENT FOR COMPARISON WITH THE ACTUAL ACTIVITY IN YOUR ACCOUNT AT THE END OF THE ESCROW ACCOUNTING COMPUTATION YEAR.)

Cushion selected by servicer: $ _____ 1,077.58 _____

[X] Your    MONTHLY    mortgage payment for the coming year will be    $2,087.46,    of which
$1,548.67    will be for principal and interest and    $538.79    will go into your escrow account.

[ ] Your first    mortgage payment for the coming year will be    of which
will be for principal and interest and    will go into your escrow account. The
terms of your loan may result in changes to the monthly principal and interest payments during the year.

_____    Date    _____    Date
CARY BORTNICK                      DIANE BORTNICK

GRS4 710

LOAN #: 618550267

Form **W-9**
(Rev. December 2000)

Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give form to the
requester. Do not
send to the IRS.

Name (See Specific Instructions on page 2.)
CARY BORTNICK

Business name, if different from above. (See Specific Instructions on page 2.)

Check appropriate box: ☐ Individual/Sole proprietor   ☐ Corporation   ☐ Partnership   ☐ Other ▶

Address (number, street, and apt. or suite no.)
23380 BUTTERFLY PALM COURT

Requester's name and address (optional)

City, state, and ZIP code:
BOCA RATON, FL 33433

List account number(s) here (optional)

*Please print or type*

**Part I   Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. For
individuals, this is your social security number
(SSN). However, for a resident alien, sole
proprietor, or disregarded entity, see the Part I
instructions on page 2. For other entities, it is your
employer identification number (EIN). If you do not
have a number, see How to get a TIN on page 2.
Note: *If the account is in more than one name,
see the chart on page 2 for guidelines on whose
number to enter.*

Social security number
3 8 6 6 0 0 8 6 0

or

Employer identification number

**Part II   For U.S. Payees Exempt From
Backup Withholding (See the
instructions on page 2.)**

**Part III   Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

**Certification Instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 2.)

Sign
Here

Signature of
U.S. person ▶

Date ▶

**Purpose of Form**

A person who is required to file an information return with the IRS must get your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to give your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

If you are a foreign person, use the appropriate Form W-8. See Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Corporations.

Note: *If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.*

**What is backup withholding?** Persons making certain payments to you must withhold and pay to the IRS 31% of such payments under certain conditions. This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

If you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return, payments you receive will not be subject to backup withholding. Payments you receive will be subject to backup withholding if:

1. You do not furnish your TIN to the requester, or

2. You do not certify your TIN when required (see the Part III instructions on page 2 for details), or

3. The IRS tells the requester that you furnished an incorrect TIN, or

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only)

Certain payees and payments are exempt from backup withholding. See the Part II instructions and the separate Instructions for the Requester of Form W-9.

**Penalties**

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of Federal law, the requester may be subject to civil and criminal penalties.

Form W-9 (Rev. 12-2000) Cat. No. 10231X

GW9C  0102

## Specific Instructions

**Name.** If you are an individual, you must generally enter the name shown on your social security card. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first and then circle the name of the person or entity whose number you enter in Part I of the form.

*Sole Proprietor.* Enter your individual name as shown on your social security card on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name" line.

*Limited liability company (LLC).* If you are a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Treasury regulations section 301.7701-3, enter the owner's name on the "Name" line. Enter the LLC's name on the "Business name" line

*Caution: A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.*

*Other Entities.* Enter the business name as shown on required Federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or "DBA" name on the "Business name" line.

## Part I—Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box.

If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are an LLC that is disregarded as an entity separate from its owner (see *Limited liability company (LLC)* above), and are owned by an individual, enter your SSN (or "pre-LLC" EIN, if desired). If the owner of a disregarded LLC is a corporation, partnership, etc., enter the owner's EIN.

*Note: See the chart on this page for further clarification of name and TIN combinations.*

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office. Get Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can get Forms W-7 and SS-4 from the IRS by calling 1-800-TAX-FORM (1-800-829-3676) or from the IRS's Internet Web Site at www.irs.gov.

If you do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before

you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

*Note: Writing "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.*

## Part II—For U.S. Payees Exempt From Backup Withholding

Individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends. For more information on exempt payees, see the separate Instructions for the Requester of Form W-9.

If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding. Enter your correct TIN in Part I, write "Exempt" in Part II, and sign and date the form.

If you are a nonresident alien or a foreign entity not subject to backup withholding, give the requester the appropriate completed Form W-8.

## Part III—Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 3, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required).

1. **Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

2. **Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. **Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

4. **Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. **Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified state tuition program payments, IRA or MSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

**Privacy Act Notice**

Section 6109 of the Internal Revenue Code requires you to give your correct TIN to

persons who must file information returns with the IRS for interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA or MSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation and to cities, states, and the District of Columbia to carry out their tax laws.

You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 31% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.

## What Name and Number to Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 5. Sole proprietorship | The owner[3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship | The owner[3] |
| 7. A valid trust, estate, or pension trust | Legal entity[4] |
| 8. Corporate | The corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name, but you may also enter your business or "DBA" name. You may use either your SSN or EIN (if you have one).

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.)

*Note: If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.*

LOAN #: 618550267

Form **W-9**
(Rev. December 2000)

Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give form to the
requester. Do not
send to the IRS.

Name (See Specific Instructions on page 2.)
DIANE BORTNICK

Business name, if different from above. (See Specific Instructions on page 2.)

Check appropriate box: ☐ Individual/Sole proprietor  ☐ Corporation  ☐ Partnership  ☐ Other ▸ ____

Requester's name and address (optional)

Address (number, street, and apt. or suite no.)
23380 BUTTERFLY PALM COURT

City, state, and ZIP code
BOCA RATON, FL 33433

List account number(s) here (optional)

**Part I   Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 2. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 2.
Note: *If the account is in more than one name, see the chart on page 2 for guidelines on whose number to enter.*

Social security number
3 6 0 4 4 3 8 7 7

or

Employer identification number

**Part II   For U.S. Payees Exempt From Backup Withholding (See the instructions on page 2.)**

**Part III   Certification**

Under penalties of perjury, I certify that:

1.  The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2.  I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3.  I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 2.)

Sign
Here

Signature of
U.S. person ▸

Date ▸

### Purpose of Form

A person who is required to file an information return with the IRS must get your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to give your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

If you are a foreign person, use the appropriate Form W-8. See Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Corporations.

Note: *If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.*

**What is backup withholding?** Persons making certain payments to you must withhold and pay to the IRS 31% of such payments under certain conditions. This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

If you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return, payments you receive will not be subject to backup withholding. Payments you receive will be subject to backup withholding if:

1. You do not furnish your TIN to the requester, or

2. You do not certify your TIN when required (see the Part III instructions on page 2 for details), or

3. The IRS tells the requester that you furnished an incorrect TIN, or

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the Part II instructions and the separate Instructions for the Requester of Form W-9.

### Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of Federal law, the requester may be subject to civil and criminal penalties.

Form W-9 (Rev. 12-2000) Cat. No. 10231X

Page 1 of 2

GW9C 0102

## Specific Instructions

**Name.** If you are an individual, you must generally enter the name shown on your social security card. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first and then circle the name of the person or entity whose number you enter in Part I of the form.

*Sole Proprietor.* Enter your individual name as shown on your social security card on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name" line.

*Limited liability company (LLC).* If you are a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Treasury regulations section 301.7701-3, enter the owner's name on the "Name" line. Enter the LLC's name on the "Business name" line.

*Caution: A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.*

*Other Entities.* Enter the business name as shown on required Federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or "DBA" name on the "Business name" line.

## Part I-Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box.

If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see How to get a TIN below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN However, the IRS prefers that you use your SSN.

If you are an LLC that is disregarded as an entity separate from its owner (see *Limited liability company (LLC)* above), and are owned by an individual, enter your SSN (or "pre-LLC" EIN, if desired). If the owner of a disregarded LLC is a corporation, partnership, etc., enter the owner's EIN.

**Note:** *See the chart on this page for further clarification of name and TIN combinations.*

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office. Get Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can get Forms W-7 and SS-4 from the IRS by calling 1-800-TAX-FORM (1-800-829-3676) or from the IRS's Internet Web Site at www.irs.gov.

If you do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before

you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note:** *Writing "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.*

## Part II-For U.S. Payees Exempt From Backup Withholding

Individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends. For more information on exempt payees, see the separate Instructions for the Requester of Form W-9.

If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding. Enter your correct TIN in Part I, write "Exempt" in Part II, and sign and date the form.

If you are a nonresident alien or a foreign entity not subject to backup withholding, give the requester the appropriate completed Form W-8.

## Part III-Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 3, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required).

**1.** Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983. You must give your correct TIN, but you do not have to sign the certification.

**2.** Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983. You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3.** Real estate transactions. You must sign the certification. You may cross out item 2 of the certification.

**4.** Other payments. You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5.** Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified state tuition program payments, IRA or MSA contributions or distributions, and pension distributions. You must give your correct TIN, but you do not have to sign the certification.

### Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to give your correct TIN to

persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA or MSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation and to cities, states, and the District of Columbia to carry out their tax laws.

You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 31% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.

## What Name and Number to Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship | The owner [3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship | The owner [3] |
| 7. A valid trust, estate, or pension trust | Legal entity [4] |
| 8. Corporate | The corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity [4] |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name, but you may also enter your business or "DBA" name. You may use either your SSN or EIN (if you have one).

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.)

**Note:** *If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.*

RE: Loan #  618550267
    Address:  23380 BUTTERFLY PALM COURT
              BOCA RATON, FL 33633

I/We, the undersigned, do hereby acknowledge that we have been informed the amount of tax escrow collected in our monthly payment of the above referenced loan is based on the estimated tax amount, rather than the unimproved amount.

I/We understand, that because of this, when an escrow analysis is conducted on this loan there may be a shortage in the escrow account.

I/We also understand that the monthly escrows for taxes in our payments are assessed in this manner rather than the unimproved amount, and if a shortage arises, I/We will submit the difference to this account.

_____     _____
CARY BORTNICK                          Date

_____     _____
DIANE BORTNICK                         Date

LOAN #: 618550267

# ABN-AMRO

## PRIVACY STATEMENT
Privacy policy of the affiliates of
ABN AMRO North America, Inc.

**A message to our customers:**

At ABN AMRO, we have a long tradition of integrity and service. These are a part of our Company's core values, and are reflected in the way we serve our customers each day.

This privacy statement reflects the policy of all of the entities that make up the ABN AMRO family of companies in the United States, as listed on the pages that follow. It describes how "nonpublic personal information," which includes customer and financial information, may be collected and shared, as well as the steps we take to protect this information from unauthorized access.

This policy applies both to current and former customers, and is designed to comply with the privacy provisions in Title V of the Gramm-Leach-Bliley Act, as well as applicable federal privacy regulations.

**We take great care to safeguard your customer information and to ensure its accuracy.**

- We limit employee access to nonpublic personal information to those who need to know this information in order to serve customer relationships. Employees are educated about the importance of privacy in accordance with our Standards of Conduct Policy.
- We maintain physical, electronic and procedural safeguards that comply with all applicable regulatory standards to guard your nonpublic personal information.
- We strive to maintain complete, current and accurate information about you and your accounts. If you request a correction to our records, we will respond in a timely manner.

**We collect customer information so we are able to offer you products and enhance the service we provide to you.**

We collect and maintain nonpublic personal information in order to:

- Service your accounts and process your requests efficiently and accurately.
- Identify you and protect your accounts from unauthorized access or identity theft.
- Inform you of financial services and choices that can meet your needs now and in the future.

This information may be collected from a variety of sources, including:

- Information we receive from you on applications or other loan or account forms, such as your name, address, and financial information.
- Information we receive through your transactions or experiences with affiliates within the ABN AMRO family of companies, such as your account balance and securities holdings.
- Information we receive from outside companies, such as a credit reporting agency or real estate appraiser.

**We may share information with nonaffiliated third parties who are acting on our behalf.**

We may disclose all the information we collect, as described above. Information is shared with nonaffiliated third parties only when those parties are acting on our behalf, or as required or permitted by law. These third parties may include:

- Service providers who provide support services to help us administer your financial relationship. They may include check printers, data processing companies, companies that prepare account statements, or companies that help us market our products to you. These companies are legally obligated to maintain the confidentiality of the information we provide to them, and are restricted from using this information for any reason beyond the performance of specified services on our behalf.
- Companies who work with us under joint marketing agreements to provide you with financial services that we do not offer ourselves but we believe may be of interest to you. In such cases, we may share information we collect, as described above, but only as necessary to offer these services to you. These companies are legally obligated to maintain the confidentiality of the information we provide to them, and are restricted from using this information for any reason other than what is specified in the agreement.
- Other parties as permitted or required by applicable law. These may include, for example, government agencies in response to subpoenas and other legal processes, consumer reporting agencies, or those with whom you have authorized us to share information.

**Within the ABN AMRO family of companies, information may be shared in order to service your relationship and meet your financial needs.**

The ABN AMRO family of companies works together to help you achieve your financial goals. We may share information among our affiliated companies to process your transactions, such as ATM withdrawals or credit approvals, as well as to offer you additional financial services that may be of interest or value to you. As listed in this statement, the ABN AMRO family of companies encompasses a number of different banks and companies that provide a wide range of quality financial services, including mortgages, investments, and insurance. In order to evaluate your needs and to introduce you to additional financial services, we are permitted to share among these companies information about your transactions, account history or other experiences with us.

In addition, we may also share within our family of companies non-experience information. Information received from applications or outside sources such as credit reporting agencies is considered non-experience information. Under the Fair Credit Reporting Act, you may advise us that you do not want us to share this non-experience information within the ABN AMRO family of companies, by completing and mailing the attached Opt-Out

L4008PR1 0106

LOAN #: 618550267

Request Form. Please allow a reasonable period of time (up to 90 days) for us to process your request. Whether or not you choose to opt out, we may share identifying information about your transactions and experiences within the ABN AMRO family of companies. Even if you choose to opt out, you will continue to receive statements, statement inserts and other account information, but you may not receive special offers that could be of value to you from other affiliates in the ABN AMRO family of companies.

**Our privacy standards represent the privacy policy of the affiliates listed below.**

**Banks**
ABN AMRO Bank, N.V. - Miami Agency
ABN AMRO Bank, N.V. - Miami Office
ABN AMRO Bank, N.V. - New York Branch
European American Bank
LaSalle Bank National Association
Standard Federal Bank
Michigan National Bank
**Home Mortgage**
ABN AMRO Mortgage Group, Inc.
    ABN AMRO Mortgage
    ABN AMRO National Lending Center
    Atlantic Mortgage & Investment Corporation
    InterFirst Wholesale Mortgage Lending
    LaSalle Home Mortgage
    Mortgage.com
EAB Mortgage Company, Inc.
**Financial Services**
ABN AMRO Asset Management (USA) LLC
ABN AMRO Deferred Exchange Corporation
ABN AMRO Financial Services, Inc.
    EAB Financial Strategies
    LaSalle Financial Services
    LaSalle Insurance Services
    LaSalle Capital Markets
    Wealth Management Securities Services
    Standard Capital Markets
    Standard Financial Services
    Standard Insurance Services
ABN AMRO Fund Services, Inc.
ABN AMRO Incorporated
ABN AMRO Sage Corporation
Blairlogie Capital Management
Bluestone Private Equity Management, Inc.
Bluestone Private Equity, L.P.
Chicago Deferred Exchange Corporation
Chicago Deferred Exchange Corporation of California
Executive Relocation Corporation
Independence One Brokerage Services, Inc.
Independence One Capital Management Corp.
Lease Plan Illinois, Inc.
Tamro Capital Partners LL
The Chicago Trust Company
The Chicago Trust Company of California
Veredus Asset Management LLC

---

**Fair Credit Reporting Act**
**Opt-Out Request Form**

Account Type(s) Account Number(s)
(e.g., mortgage, checking, etc.)

_____
_____
_____
_____
_____
_____
_____
_____
_____

Please complete all information in this form, cut it out and mail it back to us at the following address:

ABN AMRO Mortgage Group, Inc.
P.O. Box 5065
Troy, MI 48007-5065

Please exclude me from non-experience information sharing within the ABN AMRO family of companies as described above.

Please print:

_____
DATE

_____
NAME

_____
ADDRESS                    APT. NUMBER

_____
CITY            STATE          ZIP CODE

☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐
SOCIAL SECURITY NUMBER (Required to process your request)

Please provide a telephone number that we may use to contact you if we have questions:

( _____ ) _____

AAMG 259-BR20943 MAY 01                                         L4008PRI

# ERRORS AND OMISSIONS CORRECTION AGREEMENT

LENDER: ABN AMRO MORTGAGE GROUP, INC.


BORROWER(S): CARY BORTNICK AND DIANE BORTNICK


LOAN NO: 618550267

PROPERTY ADDRESS: 23380 BUTTERFLY PALM COURT, BOCA RATON, FL, 33433


For a good and valuable consideration, and as a condition of the extension of credit evidenced by the above referenced loan, the Borrower(s) and Seller(s) [if any] agree, if requested by the Note Holder, Lender, Representative or Agent for Lender and/or Mortgage Broker (herein ''Lender''), to cooperate as hereinafter set forth.

In the event any of the documents evidencing and/or securing the above referenced loan referred to above are lost or misstate or inaccurately reflect the true and correct terms and provisions of the loan, Borrower(s) and any Seller(s) shall upon request by Lender and in order to correct such misstatement or inaccuracy, execute such new documents or initial such corrected original documents as Lender may deem necessary to remedy said inaccuracy or mistake.

The agreements contained herein shall apply whether said misstatement or inaccuracy is due to unilateral mistake on the part of the Lender or Borrower(s) or any Seller(s), mutual mistake on the part of the Lender and Borrower(s) and any Seller(s) or clerical error on the part of any party to the transaction.

Failure by any party to initial or execute such documents as and when requested hereunder shall constitute a breach of the contractual agreement evidenced hereby and shall also constitute a default under the Note evidencing the Deed of Trust or Security Instrument securing the loan.

This agreement shall be binding on the signatories hereto, their heirs and assigns, and shall insure to the benefit of Lender, its successors and assigns.

Time is of the essence concerning all agreements contained herein.

Dated the    31ST    day of  OCTOBER, 2001.


_____          _____
CARY BORTNICK                                Date


_____          _____
DIANE BORTNICK                               Date

LOAN #: 618550267

## NOTICE OF RIGHT TO RECEIVE A COPY OF YOUR APPRAISAL

You have the right to a copy of the appraisal report, if any, used in connection with your application for credit. If you wish a copy, please write to us at the mailing address below. Please type or print, sign and date your request, and include the following information: Your full name and mailing address; account number; property address (if different); telephone number with area code; and a statement that this is a request for a copy of your home mortgage loan or consumer loan appraisal report. We must hear from you no later than 90 days after we notify you about the action taken on your loan application or you withdraw your application.

ABN AMRO MORTGAGE GROUP, INC.
2600 W. BIG BEAVER RD.
TROY, MICHIGAN 48084

Please include        $5.00        with your letter to cover the photocopying, postage and handling charge.

I/We acknowledge receipt of a copy of this notice.

CARY BORTNICK _____        Date _____

DIANE BORTNICK _____        Date _____

(06-24-96) C-101835-11

1457APP 703

LOAN #: 618550267

**Servicing**
**Disclosure Statement**

ABN AMRO MORTGAGE GROUP, INC.
2600 W. BIG BEAVER RD.
TROY, MICHIGAN 48084
(810) 643-9600

NOTICE TO FIRST LIEN MORTGAGE LOAN APPLICANTS: THE RIGHT TO COLLECT YOUR MORTGAGE LOAN PAYMENTS MAY BE TRANSFERRED. FEDERAL LAW GIVES YOU CERTAIN RELATED RIGHTS. IF YOUR LOAN IS MADE, SAVE THIS STATEMENT ALONG WITH YOUR LOAN DOCUMENTS. SIGN THE ACKNOWLEDGEMENT AT THE END OF THIS STATEMENT ONLY IF YOU UNDERSTAND ITS CONTENTS.

Because you are applying for a mortgage loan covered by the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. § 2601 et seq.), you have certain rights under that Federal law.

This statement tells you about those rights. It also tells you what the chances are that the servicing for this loan may be transferred to a different loan servicer. "Servicing" refers to collecting your principal, interest and escrow account payments if any. If your loan servicer changes, there are certain procedures that must be followed. This statement generally explains those procedures.

**Transfer Practices and Requirements**

If the servicing of your loan is assigned , sold, or transferred to a new servicer, you must be given written notice of that transfer. The present loan servicer must send you notice in writing of the assignment, sale or transfer of the servicing not less than 15 days before the effective date of the transfer. The new loan servicer must also send you notice within 15 days after the effective date of the transfer. The present servicer and the new servicer may combine this information in one notice, so long as the notice is sent to you 15 days before the effective date of transfer. The 15 day period is not applicable if a notice of prospective transfer is provided to you at settlement. The law allows a delay in the time (not more than 30 days after a transfer) for servicers to notify you, upon the occurrence of certain business emergencies.

Notices must contain certain information. They must contain the effective date of the transfer of the servicing of your loan to the new servicer, and the name, address, and toll-free or collect call telephone number of the new servicer, and toll-free or collect call telephone numbers of a person or department for both your present servicer and your new servicer to answer your questions. During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

**Complaint Resolution**

Section 6 of RESPA (12 U.S.C. §2605) gives you certain consumer rights, whether or not your loan is transferred. If you send a "qualified written request" to your loan servicer, your servicer must provide you with a written acknowledgement within 20 Business Days of receipt of your request.

A Business Day is any day in which the offices of the Bank are open to the public for carrying on substantially all of its business functions. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and the information regarding your request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, or must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

**Damages and Costs**

Section 6 of RESPA also provides for damages and costs for individuals or classes or individuals in circumstances where servicers are shown to have violated the requirements of that Section.

**Servicing Transfer Estimates by Original Lender**

1. The following is the best estimate of what will happen to the servicing of your mortgage loan: We may assign, sell or transfer the servicing of your loan while the loan is outstanding depending on your type of loan and other factors. For the program you have applied for, we expect to sell 25% of the mortgage servicing.

2. For all the first lien mortgage loans that we make in the 12-month period after your mortgage loan is funded, we estimate that the percentage of such loans for which we will transfer servicing is between:

   ☐ 0 to 25%
   ☒ 26 to 50%
   ☐ 51 to 75%
   ☐ 76 to 100%

   This estimate does not include assignments, sales or transfers to affiliates or subsidiaries.

   This is only our best estimate and it is not binding. Business conditions or other circumstances may affect our future transferring decisions.

(05-15-96) C-101715-11                                    Page 1 of 2                                    1457DIS  703

LOAN #: 618550267

3.   We have previously assigned, sold, or transferred the servicing of first lien mortgage loans.

**Acknowledgment of Mortgage Loan Applicant**

I/we have read this disclosure form, and understand its contents, as evidenced by my/our signature(s) below. I/we understand that this acknowledgement is a required part of the mortgage loan application.

_____    _____
CARY BORTNICK                                 Date

_____    _____
DIANE BORTNICK                                Date

"Lender": ABN AMRO MORTGAGE GROUP, INC.

Loan No.: 618550267

## INSURANCE AUTHORIZATION

The Security Instrument (deed of trust, mortgage, security deed, etc) which secures the loan noted above requires that proper fire, hazard, flood (if applicable) and/or other property insurance be carried in the amount of the loan to protect you and also the Lender ("we", "us", "our") and authorizes us to obtain the insurance on your behalf if you fail to do so. (See also Security Instrument for further information).

The insurance policies may be provided by an agent of your choice; however, policies or evidences of insurance, in a form reasonably acceptable to us, must be in our office prior to the closing of the loan. Also, a renewal policy for each policy must be in our office at least 15 days prior to the expiration date of the previous policy. In the event any renewal policy is not in our office within the required time, we will order a renewal policy in like amount and for like coverages from an agent of our choice.

Please sign a copy of this notice as our authority to release information reasonably necessary for us to obtain a renewal policy.

Executed this      31ST      day of   OCTOBER, 2001.


_____          _____
CARY BORTNICK                                Date


_____          _____
DIANE BORTNICK                               Date


THIS FORM IS PART OF THE CLOSING PACKAGE

PLEASE HAVE BOTH COPIES SIGNED
GIVE ONE TO THE BORROWER
RETURN ONE FOR OUR FILES


(9-23-95) S 100387-13                                      1457INA  703

"Lender": ABN AMRO MORTGAGE GROUP, INC.

Loan No.: 618550267

## INSURANCE AUTHORIZATION

The Security Instrument (deed of trust, mortgage, security deed, etc) which secures the loan noted above requires that proper fire, hazard, flood (if applicable) and/or other property insurance be carried in the amount of the loan to protect you and also the Lender ("we", "us", "our") and authorizes us to obtain the insurance on your behalf if you fail to do so. (See also Security Instrument for further information).

The insurance policies may be provided by an agent of your choice; however, policies or evidences of insurance, in a form reasonably acceptable to us, must be in our office prior to the closing of the loan. Also, a renewal policy for each policy must be in our office at least 15 days prior to the expiration date of the previous policy. In the event any renewal policy is not in our office within the required time, we will order a renewal policy in like amount and for like coverages from an agent of our choice.,

Please sign a copy of this notice as our authority to release information reasonably necessary for us to obtain a renewal policy.

Executed this    31ST    day of   OCTOBER, 2001.

_____    _____
CARY BORTNICK                        Date

_____    _____
DIANE BORTNICK                       Date

THIS FORM IS PART OF THE CLOSING PACKAGE

PLEASE HAVE BOTH COPIES SIGNED
GIVE ONE TO THE BORROWER
RETURN ONE FOR OUR FILES

(9-23-95) S 100387-13                        1457DNA 703

RE: LOAN #: 618550267
   CARY BORTNICK AND DIANE BORTNICK

23380 BUTTERFLY PALM COURT, BOCA RATON, FL, 33433

## FLOOD INSURANCE AUTHORIZATION

The National Flood Insurance Reform Act of 1994 mandates the purchase of flood insurance when appropriate, if available. Therefore, the above referenced Borrower(s) hereby authorize(s) Lender, and its assigns, to purchase flood insurance during the life of the loan secured by the above-described Property.

This authorization is extended only in the case where a determination is made subsequent to closing that flood insurance is necessary, because the Lender has determined the improved real property or mobile home and personal property securing the loan is located both in a Special Flood Hazard Area (SFHA) as determined by the Director of the Federal Emergency Management Agency (FEMA), and in a community participating in the National Flood Insurance Program (NFIP). In such event, unless a different standard is permitted by law or regulation and such standard is imposed, flood insurance shall be purchased in the amount of the loan or the maximum amount available under the NFIP, whichever is less.

At any time during the life of the loan secured by the above-described Property, such flood insurance policy may be purchased from the agent designated by Borrower(s) and subsequently furnished to Lender. The premiums and fees incurred shall be paid by Borrower(s) and may be paid from the escrow funds on hand and the proper adjustments made to the monthly payments. Borrower(s) agrees that if the Lender or Servicer is escrowing for items such as taxes and property insurance, they are required to also escrow for required flood insurance costs.

Lender shall provide Borrower(s) with written notice that flood insurance must be purchased, the amount necessary, and an estimate of the cost. If a response is not received from the Borrower(s) within 45 days of such notice, Lender is hereby authorized to force-place the required flood insurance from whatever source advisable under the circumstances and provide the Borrower(s) with a copy of the policy.

If there is a dispute or uncertainty on the part of the Lender or Borrower about the flood determination, they may jointly request FEMA to review and resolve whether the building or mobile home or personal property in question is located in an SFHA. FEMA will review the determination and provide the Lender and Borrower(s) a final determination with 45 days.

_____  Date    _____  Date
CARY BORTNICK                            DIANE BORTNICK

### CERTIFICATION BY SELLER(S)

This is to certify that the above reference Property which I/we are selling is not now (or to the best of my/our knowledge ever been) located in a flood area.

_____          _____
SELLER                                   SELLER

(05-22-96) S-100389-11                                              1457FLD  703

TREASURER - TAX COLLECTOR OFFICE                    OCTOBER 31ST, 2001

_____

_____

_____

Re:   Tax I.D.#
      Loan No.  618550267

Property Address: 23380 BUTTERFLY PALM COURT, BOCA RATON, FL, 33433

Gentlemen:

As the new owner of the aforementioned property, we hereby authorize you to forward all tax bills to the following address:

          FIRST AMERICAN REAL ESTATE TAX SERVICE
          8435 NORTH STEMMONS FREEWAY
          DALLAS, TX 75247

I further authorize that in the event of the assignment of the mortgage or the establishment of another paying agent, for property taxes, that the tax bills may be forwarded to the assignee or the paying agent immediately upon notification.

_____          _____
CARY BORTNICK                                Date


_____          _____
DIANE BORTNICK                               Date

(06-25-96) C-101831-II                    I4577XC  0002

# MORTGAGOR'S AFFIDAVIT

LENDER: ABN AMRO MORTGAGE GROUP, INC.

BORROWER(S):  CARY BORTNICK AND DIANE BORTNICK

LOAN/CASE NUMBER:  618550267
PROPERTY ADDRESS:
23380 BUTTERFLY PALM COURT
BOCA RATON, FL 33433
HOME NUMBER: _____    WORK NUMBER: _____

(      )  I (we) presently occupy, or intend to occupy, the subject property as my(our) principal residence, and am(are) not now considering any proposals to sell the subject property to third persons.

(  x  )  This is certify that I(we), am(are) currently working at the same job and have approximately the same income and obligations that I(we) had when I(we) signed the application for said loan; that I(we) have not received any notice of layoff, nor do I(we) have any knowledge of any pending layoff that will affect my(our) ability to make the monthly mortgage payments on this loan.

(      )  The total purchase price for the subject property is

(  x  )  The required downpayment, settlement costs, and prepaid expenses as required to legally settle this purchase transaction were paid by me(us).

(  x  )  I(we) have been given the opportunity to choose the carrier and the agent of the required mortgage title insurance, hazard insurance subject to approval by the Mortgagee, which approval has not been unreasonably withheld.

(      )  All of the conditions, including but not limited to Inspections, of the Contract/Offer to Purchase signed and executed by me(us) have been satisfactorily met and accepted.

(  x  )  I(we) hereby request that all mortgage related notices and materials be mailed to me(us) at this location:

_____ Property address: (on file)
_____ Mailing address: _____
                          Street or P.O. Box
                          _____
                          City, State, Zip Code

Should my mailing address change in the future, I will immediately notify the Customer Service Department of Lender. Acknowledgment by Lender of a mailing address which differs from the property address does not constitute an implied waiver of any owner-occupancy provision carried in the mortgage documents.

(  x  )  I(we) have been advised of my(our) rights under the Equal Credit Opportunity Act, and the Real Estate Settlement Procedures Act.

I certify that the above applicable representations are true and correct as of this                day of

_____            _____
CARY BORTNICK                            DIANE BORTNICK

Sworn to and subscribed before me this                day of

_____
Notary Public

(9-12-95) S 100172-11                                              1457MTG  707

Date: OCTOBER 31, 2001
Loan Number: 618550267
Borrowers: CARY BORTNICK AND DIANE BORTNICK

## IDENTITY CERTIFICATE/NAME AFFIDAVIT

THE STATE OF FLORIDA

COUNTY OF PALM BEACH

BEFORE ME, the undersigned authority, a Notary Public in and for said County and State, on this day personally appeared CARY BORTNICK

who after being by me first duly sworn, upon oath depose and say:

THAT, CARY BORTNICK

as the name is signed on the note and security instrument and all other closing documents is one and the same person as CARY BORTNICK

as the name appears on the various papers in the loan application.

Property Address: 23380 BUTTERFLY PALM COURT
                  BOCA RATON, FL 33433

_____     _____
CARY BORTNICK                                DATE

SUBSCRIBED AND SWORN TO BEFORE ME this          day of

_____
Notary Public in and for

_____

IDENTITY CERT./NAME AFFIDAVIT (9-8-95) S 500376-33                    1457IDC  703

Date: OCTOBER 31, 2001
Loan Number: 618550267
Borrowers: CARY BORTNICK AND DIANE BORTNICK

## IDENTITY CERTIFICATE/NAME AFFIDAVIT

THE STATE OF FLORIDA

COUNTY OF PALM BEACH

    BEFORE ME, the undersigned authority, a Notary Public in and for said County and State, on this day personally appeared
DIANE BORTNICK

who after being by me first duly sworn, upon oath depose and say:

    THAT, DIANE BORTNICK

as the name is signed on the note and security instrument and all other closing documents is one and the same person as
DIANE BORTNICK

as the name appears on the various papers in the loan application.

Property Address: 23380 BUTTERFLY PALM COURT
                  BOCA RATON, FL 33433

_____     _____
DIANE BORTNICK                                                              DATE

SUBSCRIBED AND SWORN TO BEFORE ME this           day of

_____
Notary Public in and for

_____

IDENTITY CERT./NAME AFFIDAVIT (9-8-95) S 100176-11

I4571DC 703

LOAN #: 618550267

ABN AMRO MORTGAGE GROUP, INC.
2600 W. BIG BEAVER RD.
TROY, MICHIGAN 48084
800-542-9512
313-741-5180

## HOLD HARMLESS

DATE: OCTOBER 31, 2001
   RE: 618550267
      CARY BORTNICK AND DIANE BORTNICK


   I/We the undersigned, agree to hold   ABN AMRO MORTGAGE GROUP, INC.


harmless for the

on the above referenced property. We will assume full responsibility for any maintenance or upkeep necessary.


_____
CARY BORTNICK


_____
DIANE BORTNICK

1457HHL 707

LOAN #: 618550267

## NOTICE OF SPECIAL FLOOD HAZARDS AND
## AVAILABILITY OF FEDERAL DISASTER RELIEF ASSISTANCE

We are giving you this notice to inform you that:

The building securing the loan for which you have applied is or will be located in an area with special flood hazards.

The area has been identified by the Director of the Federal Emergency Management Agency (FEMA) as a special flood hazard area using FEMA's Flood Insurance Rate Map; or the: Flood Hazard Boundary Map for the following community:
This area has a one percent (1%) chance of flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year. During the life of a 30-year mortgage loan, the risk of a 100-year flood in a special flood hazard area is 26 percent (26%).

Federal law allows a lender and borrower jointly to request the Director of FEMA to review the determination of whether the property securing the loan is located in a special flood hazard area. If you would like to make such a request, please contact us for further information.

_____ The community in which the property securing the loan is located participates in the National Flood Insurance Program (NFIP). Federal law will not allow us to make you the loan that you have applied for if you do not purchase flood insurance. The flood insurance must be maintained for the life of the loan. If you fail to purchase or renew flood insurance on the property, Federal law authorizes and requires us to purchase the flood insurance for you at your expense.

- Flood insurance coverage under the NFIP may be purchased through an insurance agent who will obtain the policy either directly through the NFIP or through an insurance company that participates in the NFIP. Flood insurance also may be available from private insurers that do not participate in the NFIP.

- At a minimum, flood insurance purchased must cover the lesser of:
  (1) the outstanding principal balance of the loan; or
  (2) the maximum amount of coverage allowed for the type of property under the NFIP.

Flood insurance coverage under the NFIP is limited to the overall value of the property securing the loan minus the value of the land on which the property is located.

- Federal disaster relief assistance (usually in the form of a low-interest loan) may be available for damages incurred in excess of your flood insurance if your community's participation in the NFIP in accordance with NFIP requirements.

_____ Flood insurance coverage under the NFIP is not available for the property securing the loan because the community in which the property is located does not participate in the NFIP. In addition, if the non-participating community has been identified for at least one year as containing a special flood hazard area, properties located in the community will not be eligible for Federal disaster relief assistance in the event of a Federally declared flood disaster.

I acknowledge receipt of a copy of this notice of Special Flood Hazards.


CARY BORTNICK                                          Date


DIANE BORTNICK                                         Date


1457HAZ 708

LOAN #: 618550267

Date: OCTOBER 31, 2001
Lender: ABN AMRO MORTGAGE GROUP, INC.

Borrower(s): CARY BORTNICK AND DIANE BORTNICK

## ANTI-COERCION NOTICE

The following statement is required under Rule 4-124.002
of the Rules and Regulations promulgated by the Florida
Insurance Commissioner relative to anti-coercion.

4-124.002, 4-124.013 FAC:
The Insurance Laws of the State of Florida provide that the lender may not require the borrower(s) to take insurance through any particular insurance agent or company to protect the mortgaged property.

The borrower(s), subject to the rules adopted by the Insurance Commissioner, has/have the right to have the insurance placed with an insurance agent or company of his/her choice, provided such company and/or agency meets the requirements of the lender. The lender has the right to designate reasonable financial requirements as to the company and the adequacy of the coverage.

I have read the foregoing statement, or the rules of the Insurance Commissioner relative thereto, and understand my/our rights and privileges and those of the lender relative to the placing of such insurance on the property located at:
23380 BUTTERFLY PALM COURT
BOCA RATON, FL 33433

I have selected the

whose address is

to write the hazard insurance coverage.

Borrower(s):

_____     _____
CARY BORTNICK                                Date

_____     _____
DIANE BORTNICK                               Date

Online Documents, Inc.

FLANTI 0107

**CHASE** ⬡

**Chase Home Finance LLC**
P. O. Box 47020
Doraville, GA  30362
(877) 530-8951 Insurance Processing Center

July 11, 2006

Mr. Cary Bortnick
Ms. Diane Bortnick
16 Kenmore Avenue
Deerfield IL 60015

Re:  Loan #1692959298

Dear Mr. and Ms. Bortnick:

This letter is in response to the correspondence that we received from Mr. Elliot M. Samuels on May 31, 2006, about the homeowner's insurance policy that Chase Home Finance purchased on your behalf.  We are also responding to Mr. Samuels' correspondence addressed to American Security Insurance Company about your escrow activity as it pertains to your homeowner's insurance.

We reviewed your account and found the following information:

- On October 2, 2003, we sent a premium payment of $1,901.00 to Harbor Specialty Insurance Company for the period of October 6, 2003 to October 6, 2004.
- On October 13, 2003, we sent a second premium payment of $1,901.00 to Tower Hill.
- On October 13, 2003, we also sent a third premium payment of $1,901.00 to Harbor Specialty by express mail.
- On October 22, 2003, we placed a stop on the payment that we sent on October 2, 2003, and deposited $1,901.00 into your escrow account, because Harbor Specialty did not receive our payment.
- On November 25, 2003, we deposited a second refund of $1,901.00 into your escrow account due to the duplicate payment.
- On October 27, 2004, we sent a premium payment of $1,957.00 to Harbor Specialty for the period of October 6, 2004 to October 6, 2005.
- On January 28, 2005, we deposited $1,957.00 into your escrow account, because Harbor Specialty did not receive our payment.
- On September 29, 2005, we sent a premium payment of $1,957.00 to Harbor Specialty for the period of October 6, 2005 to October 6, 2006.  However, your homeowner's insurance policy cancelled on October 6, 2004.
- On November 23, 2005, we received a call from you informing us that your home sustained damages from flooding and that Harbor Specialty cancelled your homeowner's insurance policy. Based on this information, we forwarded a request to our Claims Department to research your loss.



**EXHIBIT**

B

FROM :                                    FAX NO. :                          Jun. 14 2003 11:15AM  P1

# CHASE ⚙

**CHASE HOME FINANCE LLC**
P.O. BOX 47020
DORAVILLE, GA  30362
1-877-530-8951  Insurance Processing Center

11/28/3005

CARY BORTNICK
16 KENMORE AVE
DEERFIELD, IL  60015-4748

SUBJECT:    Property Location:    23380 BUTTERFLY PALM
                                                BOCA RATON, FL  33433
            RE:  Loan Number:    1692959298

Dear Customer(s)

During a recent audit of our files, it was determined that we did not have current hazard insurance information for your account.

We request your assistance to update your account.  Under the terms of your mortgage agreement, we are required to have current insurance information on file.  Please contact your agent or company to verify your policy includes a mortgagee clause which reads:

> **CHASE HOME FINANCE LLC**
> **ITS SUCCESSORS AND/OR ASSIGNS**
> **P.O. BOX 47020**
> **DORAVILLE, GA  30362**

A correct mortgagee clause, including your loan number, will ensure that we receive future insurance notices in a timely manner and will enable the prompt payment of insurance premiums on your behalf.  Please have your agent forward your current insurance information to the address shown above or fax the policy information to the Insurance Department at  678-475-8799.  You may also provide this information to us by visiting our web at mycoverageinfo.com, referencing PIN CMM8600.

It is important that we receive this information within 15 days from receipt of this letter.  To ensure prompt service, please include your loan number on all correspondence mailed or faxed to our office.

Thank you for taking the time to help us with this request.

Sincerely,

Hazard Insurance Department



## IMPORTANT BANKRUPTCY INFORMATION

If you or your account are subject to pending bankruptcy proceedings, or if you received a bankruptcy discharge, this correspondence is for informational purposes only and is not an attempt to collect a debt.



**CHASE**

Chase Home Finance LLC
P. O. Box 47020
Doraville, GA 30362
(877) 530-8951 Insurance Processing Center

December 19, 2005

Mr. Cary Bortnick
Ms. Diane Bortnick
1439 Rose Circle
West Palm Beach FL  30303

Re:  Loan # 1692959298

Dear Mr. and Ms. Norman:

This letter is to inform you that Chase Home Finance is insuring your property through American Security Insurance equivalent to the policy issued with Harbor Specialty Insurance.

You will shortly receive a policy issued through American Security Insurance effective from 1/25/05 to 1/25/06.  This letter is for your documentation of the policy in the interim of receiving it in the mail.

Chase's goal is to provide the highest level of quality service.  If you have any questions, please call me at (877) 498-5650 Ext 28508.

Our Web site address is www.chase.com if you would like to visit us on the Internet.

Sincerely,

David Diggs
Unit Manager
Research Department

MAY 24 2006 11:00



**EXHIBIT**

PAGE.01

| | |
|---|---|
| 2120 – Served | 2121 – Served |
| 2220 – Not Served | 2221 – Not Served |
| 2320 – Served By Mail | 2321 – Served By Mail |
| 2420 – Served By Publication | 2421 – Served By Publication |
| SUMMONS | ALIAS - SUMMONS     CCG N001-10M-1-07-05 ( ) |

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
COUNTY DEPARTMENT, _____ CHANCERY _____ DIVISION

**RECEIVED**
STATE OF ILLINOIS

MAY 2 3 2008
*10:50 TC*
**DEPT. OF INSURANCE**
**CHICAGO, ILLINOIS**

(Name all parties)

CARY BORTNICK and DIANE BORTNICK

v.

CHASE HOME FINANCE, L.L.C., a Delaware Limited
Liability Company, and AMERICAN SECURITY
INSURANCE COMPANY d/b/a ASSURANT SPECIALTY
PROPERTY,

SUMMONS

No. **08CH17522**

Please Serve:
    See Attached

**To each Defendant:**

    YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑    Richard J. Daley Center, 50 W. Washington, Room ___802___, Chicago, Illinois 60602

❑   District 2 - Skokie
    5600 Old Orchard Rd.
    Skokie, IL 60077

❑   District 3 - Rolling Meadows
    2121 Euclid
    Rolling Meadows, IL 60008

❑   District 4 - Maywood
    1500 Maybrook Ave.
    Maywood, IL 60153

❑   District 5 – Bridgeview
    10220 S. 76th Ave.
    Bridgeview, IL 60455

❑   District 6 - Markham
    16501 S. Kedzie Pkwy.
    Markham, IL 60426

❑   Child Support
    28 North Clark St., Room 200
    Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

    This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: ___48733___

Name: ___Elliot M. Samuels___

Atty. for: ___Plaintiffs___

Address: ___30 South Wacker Drive; Suite 2300___

City/State/Zip: ___Chicago, IL 60606___

Telephone: ___312-357-0590___

Service by Facsimile Transmission will be accepted at: _____

WITNESS, _____

MAY 1 3 2008

*DOROTHY BROWN*
CLERK OF CIRCUIT COURT

Date of service: _____
    (To be inserted by officer on copy left with defendant
    or other person)

_____
(Area Code)   (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**DEFENDANT'S EXHIBIT**
*tabbies*
B

Please serve:

Chase Home Finance, L.L.C.
c/o    Registered Agent
       CT Corporation System
       208 South LaSalle Street
       Suite 814
       Chicago, IL  60604


American Security Insurance Company
c/o    Director of Insurance
       Illinois Department of Insurance
       100 West Randolph Street
       Suite 15-100
       Chicago, IL  60601

WGB/MMS

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CARY BORTNICK and DIANE BORTNICK,      )
                                    )
           Plaintiffs,           )
v.                              )    No.
                                    )
CHASE HOME FINANCE, L.L.C., a Delaware Limited )
Liability Company, and AMERICAN SECURITY    )
INSURANCE COMPANY d/b/a ASSURANT         )
SPECIALTY PROPERTY,                )
                                  )
           Defendants.        )

## CONSENT TO REMOVAL

The undersigned, as counsel for defendant, CHASE HOME FINANCE, L.L.C., a

Delaware Limited Liability Company, hereby consents to and joins in the removal of

the above-referenced cause from the Circuit Court of Cook County, Illinois to the

United States District Court for the Northern District of Illinois, Eastern Division, in

accordance with the Notice of Removal prepared and filed by defendant, AMERICAN

SECURITY INSURANCE COMPANY.  This defendant was served on May 27, 2008.

Respectfully submitted,

BY: _____
One of the attorneys for Chase Home
Finance

Edward Lesniak
Burke, Warren, MacKay & Serritella
330 N Wabash Ave Ste 2200
Chicago, IL 60611-7619

